[Civ. No. 753. Third Appellate District.—February 24, 1911.]

DANIEL CARR, Administrator of the Estate of MICHAEL CARR, Deceased, Respondent, v. M. K. CARR, Appellant, and VALLEJO VALLEY COMMERCIAL BANK, a Corporation, Respondent.

ACTION BY ADMINISTRATOR—DEFECTIVE TITLE CURED BY COMPLAINT.— The omission of the word "as" in the title of an action by an administrator is cured by clear and distinct averments in the complaint showing that the action is not brought by the administrator in his individual capacity, but as the duly qualified and acting administrator of the estate to recover moneys claimed to belong to the estate, and alleged to have been demanded by him, "as such administrator," and to have been refused to be delivered to him "as such administrator."

ID.—JUDGMENT FOR ADMINISTRATOR—UNDISPUTED FACTS—LEGAL EFFECT OF FINDINGS—SUPPORT OF JUDGMENT—REVIEW UPON APPEAL.—Although judgment was for the administrator and against the personal defendant, who claimed the legal right to the money, yet where the facts are undisputed, and the single question presented

upon appeal is as to their legal effect, and as to whether the findings of the undisputed facts warrant the conclusions of law and support the judgment, it is held otherwise, and that judgment should be ordered for defendant upon the findings.

ID.—TRANSFER OF BANK DEPOSIT—JOINT OWNERSHIP OF FATHER AND SON—SURVIVORSHIP OF RESIDUE—DIRECTION TO BANK—INTENTION.—Where a bank deposit in the name of a father was transferred to the account of himself and his son as "joint owners," with the unrestricted right of either to make withdrawals during their joint lives, with direction to the bank to pay the residue of the deposit to "the survivor" upon the death of the other, the intention of the father is thereby clearly manifested that, upon his prior death, the whole residue of the deposit should vest solely in the son.

ID.—NATURE OF TRANSACTION—CREATION OF TRUST.—While the transaction lacks the essential elements of a gift either *inter vivos* or *causa mortis,* yet the manifest intention of the father can be sustained through the agency of a trust, giving the son the right to share in the deposit during their joint lives, and upon the father's death, to receive from the bank, as trustee, the remainder of the deposit in his sole and exclusive right.

ID.—TRUST FAIRLY IMPLIED.—If a trust can be fairly implied from the language used, as the intention of the parties, the intention will be executed through the medium of a trust. It is not essential to create a trust to use the words "trust" or "trustees"; yet there must be some words, it matters not what they are, which indicate with reasonable certainty a purpose to create a trust.

ID.—FACTS PROVED AND FOUND—CREATION OF TRUST UNDER LAW.—Under our law, the father was authorized to create a trust for himself and his son, in the manner and form disclosed by the evidence; and testing the facts proved and found by the law, there appears one capable of creating a trust; the subject, purpose and beneficiary thereof clearly manifested; the acceptance of the trust by the bank as trustee, by accepting the deposit, subject to its conditions and provisions; and the acts and language of the father as trustee, indicating, with reasonable certainty, an intention to create a trust.

ID.—VALID TRUST SUBJECT TO WITHDRAWAL OF DEPOSITS.—A valid trust in money may be created, subject to be diminished or practically revoked by the authorized withdrawal of the trust fund, until it may be completely exhausted before the right of survivorship can exist in the survivor as an exclusive beneficiary.

ID.—INTENTION OF TRUSTEE TO CREATE TRUST—DUTY OF COURTS.—Where the intention to create a trust is indicated with reasonable certainty by any words or acts of the party having the right to create a trust of the personal property involved in the transaction,

it is the duty of the courts to so construe such transaction as to execute such intention.

ID.—MEANING OF WORD "SURVIVOR."—The word "survivor," employed by the father in the transfer of the deposit to himself and his son, must be accorded the meaning it naturally would have when used in connection with the disposal of one's estate to take effect after the death of the owner.

ID.—SATISFACTORY METHOD OF CREATING TRUST.—Giving the word "survivor" its proper meaning, the father adopted the most satisfactory method of making his son a joint beneficiary with himself during their joint lives in the deposit and the sole beneficiary after his death of the remainder of the deposit with which this litigation is concerned, and this being so, it is the duty of the courts to respect and execute his intention through the medium of a trust in harmony with the facts proved and found.

ID.—CONCLUSION OF LAW TO BE DISREGARDED.—The finding that the father was the owner of the deposit at all times until his death is a mere conclusion, not affecting the proper judgment to be rendered upon the findings of fact.

APPEAL from a judgment of the Superior Court of Solano County. A. J. Buckles, Judge.

The facts are stated in the opinion of the court.

W. H. Morrissey, and P. B. Lynch, for Appellant.

Aitken & Aitken, for Plaintiff, Respondent.

F. A. Hall, and L. A. Hilborn, for Bank, Respondent.

HART, J.—This action was brought by plaintiff, as administrator of the estate of one Michael Carr, deceased, to recover from the defendants certain moneys which had been, in his lifetime, deposited by said Michael in the defendant bank.

Judgment passed for plaintiff, and the present appeal is by said M. K. Carr from said judgment, supported by a bill of exceptions.

It is first contended that the omission to insert the word "as" after the name of plaintiff, in the title of the action, necessarily makes the action one prosecuted by plaintiff in his individual right and not in his representative capacity. There is no merit in this claim, since the averments of the complaint themselves clearly and distinctly disclose that plaintiff brought

the action *as* the administrator of the estate of Michael Carr, deceased, and not in his own right.

The complaint sets out the death of deceased and that he died intestate; that plaintiff was duly appointed administrator of the estate of said deceased, and that he duly qualified and is acting as such; that the money referred to in said complaint is the property of said estate; that "plaintiff, *as such administrator* of the estate of Michael Carr, deceased, demanded of said defendants, and each of them, . . . that they and each of them deliver to him, *as such administrator,* said money so on deposit; that said defendants have, and each of them has, refused, and still refuse, to deliver said money, or any part thereof, to plaintiff, *as such* administrator."

These allegations are sufficient to show and, as stated, do clearly show, that the action is prosecuted by plaintiff solely in his character as administrator of the estate of the deceased, and nothing more is or ought to be required to make the pleading perfectly safe as against an assault on the ground thus urged against it. (*Burling* v. *Thompkins,* 77 Cal. 258, [19 Pac. 429], and cases therein cited.)

Upon the merits there is no dispute as to the facts. Indeed, the facts of the transaction out of which the action arises are admitted by all the parties, and, as admitted, found by the court. The single question presented for solution, as I view the record, is as to their legal effect, or, stated concretely, the question propounded is, whether the findings of fact warrant the conclusions of law and support the judgment.

From the pleadings, the evidence and stipulations of the parties are gleaned the following facts from which the findings are educed: On the twenty-fourth day of May, 1904, said Michael Carr opened a savings account with defendant bank, depositing therein on said day the sum of $730. He continued to add to said deposit from time to time and at other times drew upon the same until the eleventh day of September, 1908, on which date he had on deposit and credited to his account in said bank the sum of $996.30. "On said September 11, 1908," so alleges the answer filed by defendant bank, "the said Michael Carr, in the presence of said M. K. Carr (his son), caused said bank to change said deposit, amounting to $996.30, to the names of Michael Carr or M. K. Carr, as 'joint owners, payable to either or survivor,' and said Michael Carr

thereby agreed with said bank that said account could be paid
by said bank to either Michael Carr or M. K. Carr in the life-
time of Michael Carr, and, after the death of Michael Carr,
could be paid by said bank to M. K. Carr.'' After said de-
posit or account was so transferred to Michael and M. K. Carr,
jointly, the latter, on several different dates, drew on the same
in small amounts. Michael Carr died on the eleventh day of
November, 1908, and thereafter M. K. Carr continued to draw
on said deposit or account from time to time until he had
withdrawn therefrom the total sum of $255.

The complaint alleges that, at the time of Michael's death,
there remained in the bank, of the deposit so transferred to
Michael and M. K., the sum of $976.30, for which judgment
is prayed. The answer of the bank alleges that of the sum
so deposited there remained at the time of the commencement
of this action but the sum of $656.41. But the difference be-
tween the amount sued for and the amount which the bank
claims represented the remainder on deposit at the time of
the institution of this action is to be accounted for, manifestly,
in the withdrawals by M. K. Carr from the account after the
death of his father. The bank paid into court the said sum
of $656.41, representing the extent of the deposit at the time
the action was begun, and asked that ''the title to and owner-
ship of the said money may be litigated between said plaintiff,
as such administrator, and said M. K. Carr,'' etc.

The foregoing is a brief but an accurate statement of the
admitted facts from which the court derived its findings, of
which the following represents the gravamen of the contro-
versy:

''IV. That on May 26, 1904, said Michael Carr opened a
savings account, in his own name, with said Vallejo Commer-
cial Bank by making a deposit at that time of $730. That
thereafter said Michael Carr made deposits on and drew from
said account; that the amount on deposit in said account at
the beginning of business on September 11, 1908, was the sum
of $996.30. That on September 11, 1908, the said Michael
Carr, in the presence of said M. K. Carr, caused said bank
to change said deposit amounting to $996.30 to the name of
Michael Carr or M. K. Carr, as 'joint owners payable to either
or survivor,' and said Michael Carr thereby agreed with said
bank that said account could be paid by said bank to either

Michael Carr or M. K. Carr in the lifetime of Michael Carr,
and, after the death of Michael Carr, could be paid by said
bank to M. K. Carr. *That said deposit amounting to said
sum of $996.30 was the property of said Michael Carr, and
continued to be the property of said Michael Carr after said
bank had so changed said deposit, and at all times until the
death of said Michael Carr."*

There is, as must be manifest from the evidence as we
have presented it here, absolutely no *direct proof* of any kind
or character whatsoever authorizing the finding that after
Michael Carr had caused the deposit to be transferred to him-
self and M. K. Carr, jointly, the title to or ownership of the
money so on deposit and transferred remained at all times in
said Michael. If any such finding of fact is warranted at all,
it must find the source of its support solely in the fact that,
originally, the money deposited with the defendant bank was
exclusively Michael's own property, supported by the further
fact that, after said transfer, he retained not only an owner-
ship in the money, but the right and the power to withdraw
it at any time during his life. Was the court justified, from
these facts, in finding as a fact, or concluding as a matter of
law, that the sole ownership of the deposit in controversy after
the transfer thereof as described by the evidence and found
by the court still remained in Michael? Or, to state the
proposition in another form, does the evidence warrant the
conclusion, either of fact or of law, that Michael, although
transferring the account to his credit in the bank to himself
and his son, M. K., jointly, with the right and the unrestricted
power in either to draw on said account during their lives, and
with an express direction to the bank to pay the residue re-
maining, upon the death of either, to the survivor, did not
intend that, upon his death, the sole ownership of whatever
then remained of the deposit should vest in M. K. Carr?

It seems to me that, to hold that the court's findings as to
the intention of Michael Carr in the consummation of the
transaction or its conclusion as to the legal effect thereof are
supported by the evidence, would involve a positive disre-
gard of language whose meaning could hardly be less ambigu-
ous or palpable. That Michael Carr intended that the bank
should, upon his death, pay to M. K. Carr, for his sole benefit,
whatever remained of the joint account at the happening of

that event, is a proposition which, it appears to me, cannot admit of the remotest doubt or ground for cavil under the facts as found by the court with respect to the circumstances attending the transfer of the deposit. If the fact of transferring the deposit to the account of himself and the appellant, as joint owners, with directions to the bank to pay the same out on the order of either while both were living and the remainder to the survivor upon the death of the one or the other, does not clearly and distinctly indicate that Michael Carr intended that, upon his death, his son, M. K. Carr, should be paid by the bank, and thus receive as exclusively his own whatever balance there was then remaining in the account, then it must be admitted that the English language is a most treacherous vehicle for the transmission of thought. If Michael did not intend that the appellant should be paid the money on deposit after his death, why did he use the word "survivor"? And, if he intended that, though the money should then be paid to him, he in turn should divide it between himself and other members of the deceased's family or paid over to the administrator of his estate, why did he not so declare when he made the transfer or at some time thereafter? There is, as seen, no evidence affirmatively showing or tending to show that he had any intention that the money remaining in the bank on his death should go to or be shared by any person or persons other than M. K. Carr. And, in the ascertainment of what Michael intended by the employment of the word "survivor," as indicative of the specific thought in his mind at the time the transfer was made, the fact, as found by the court, that in so transferring said deposit, he expressly made and declared himself and appellant *joint owners* of the deposit, with full and unhampered power in the latter to draw on and thus, if he so desired, to exhaust said deposit during the lives of both, cannot be cast aside as possessing no significance. Indeed, this fact, while of itself or taken alone would not necessarily prove Michael's intent to create a trust, or perhaps would carry little or no force as proof of such intent, is, nevertheless, of considerable force as an aid in the ascertainment of what effect the deceased intended the word "survivor," as thus used by him, should have. And, I doubt not, as stated, that said fact very clearly discloses that Michael could have intended nothing less by the use of that word than

what said word naturally and etymologically means and implies.

If, then, it appears reasonably certain from the evidence as well as from the findings, as I think it undoubtedly does, that Michael's intention in this transaction was that, upon his death, M. K. Carr should become the sole owner of the residue of the money then remaining in the bank credited to their joint account, is it not the duty of the courts to carry out and execute such intention, if it can be done without impinging upon or doing violence to any rule or principle of law?

It is unquestionably true, as respondent contends, that the transaction is lacking in some of the essential requisites or elements of a gift either *inter vivos* or *causa mortis*, and the intention of Michael Carr cannot, therefore, be supported or effectuated upon the theory of either such methods of transferring personal property.

Section 1147 of our Civil Code provides that "a verbal gift," which is a transfer of personal property, made voluntarily, and without consideration (Civ. Code, sec. 1146), "is not valid, unless the means of obtaining possession and control of the thing are given, nor, if it is capable of delivery, unless there is an actual or symbolical delivery of the thing to be done."

In the case here, Michael Carr, while clearly intending that M. K. should share as a joint owner during their lives in the deposit, still retained the power of entirely destroying or exhausting by his own act the subject of the transfer, and, obviously, M. K. was not given full and complete dominion over and control of said deposit, a requisite essential to the perfection of a valid gift.

A *donatio causa mortis* "is one which is made in contemplation, fear, or peril of death, and with intent that it shall take effect only in case of the death of the giver." (Civ. Code, sec. 1149.)

Here it was clearly intended that the transfer of the deposit jointly to Michael and M. K. Carr should take effect immediately—that is, that M. K.'s interest in said deposit should vest and be enjoyed *in praesenti*, which, of course, destroys any ground for supposing an intention in Michael to make a gift of the deposit to M. K. "in contemplation, fear, or peril" of his own death.

But the manifest intention of Michael Carr can be sustained through the agency of a trust, and that such was the mode by which he intended that the appellant should share in the deposit during the life of Michael and, upon the latter's death, to receive from the bank the remainder in his sole and exclusive right, I think the evidence and the findings beyond all peradventure disclose.

Section 2221 of the Civil Code reads: "Subject to the provisions of section 852, a voluntary trust is created, as to the trustor and beneficiary, by any words or acts of the trustor indicating with reasonable certainty—1. An intention on the part of the trustor to create a trust; and 2. The subject, purpose, and beneficiary of the trust."

Section 2222 of said code provides: "Subject to the provisions of section 852, a voluntary trust is created, as to the trustee, by any words or *acts* of his indicating, with reasonable certainty: 1. His acceptance of the trust, or his acknowledgment, made upon sufficient consideration, of its existence; and 2. The subject, purpose and beneficiary of the trust."

Mr. Perry, in his treatise on Trusts, says: "If a trust can *fairly be implied* from the language used as the intention of the parties, the intention will be executed through the medium of a trust."

Nor, in order to create a trust, is it indispensable or even necessary to use the words "trust" or "trustees." (*Estate of Smith,* 144 Pa. 428, [27 Am. St. Rep. 641, 22 Atl. 916], and cases therein cited.)

Under our law Michael Carr was authorized to create a trust for himself and his son, M. K. Carr, in the manner and form disclosed by the evidence. (*Hellman* v. *McWilliams,* 70 Cal. 452, [11 Pac. 659].)

Testing the facts proved and found here by the law as thus briefly stated, I find this situation in the case at bar: One capable of creating a trust; the subject, purpose and beneficiary thereof clearly manifested; the acceptance of said trust by the trustee (the bank), evidenced by its act of accepting the deposit or the subject of the trust, subject to the conditions and provisions thereof; and the acts and the use of language by the trustor, if he be a trustor, indicating, I think, with reasonable certainty, an intention to create a trust.

There are many cases, both in this and other jurisdictions, holding that a trust was the legal effect of substantially the same state of facts as is found here. I shall, however, notice a few California cases only.

In *Booth* v. *Oakland Bank*, 122 Cal. 19, [54 Pac. 370], a Mrs. Bell requested, in writing, the teller of the bank to add the names of her two sisters to her savings account, so that she or either of said sisters could draw on the fund. The officer of the bank arranged her account as thus directed by Mrs. Bell, and subsequently she furnished the bank with the signatures of her sisters. She also apprised her sisters, then living in the east, of what she had done. The teller of the bank testified that he stated to Mrs. Bell that, under the new arrangement, her sisters could draw the money in her (Mrs. Bell's) lifetime, and that she replied, "that it made no difference—they would not do it." The court, sustaining the claim that there was sufficient evidence before the court to show that a trust had been created by the act of Mrs. Bell, and reversing the judgment of nonsuit from which the appeal was prosecuted, says: "There can be no doubt of the intention of Mrs. Bell in this matter, and that intention should be consummated if the law will permit it; and if there is any ground upon which the evidence would justify a judgment in favor of the plaintiffs the motion for a nonsuit should have been denied. . . . I do not think it necessary to determine whether the control over the fund reserved by Mrs. Bell is to be regarded as a power of revocation, or whether the whole transaction is to be regarded as a trust in her favor of so much of the fund as she might see proper to withdraw in her lifetime, and of the remainder for her sisters. In either case the practical result is the same; for a power of revocation as to the whole may be exercised as to a part, and, when so exercised, does not affect the remainder."

The only distinction discernible between the Booth case and the one at bar is that in the former it was clearly not intended that the *cestuis que trustent* should draw on the fund during the lifetime of the trustor, although having the legal right to do so, while here, as seen, it was expressly declared by the trustor that both the beneficiaries under the trust—Michael and M. K.—should receive from the bank trustee whatever

either might choose to ask for out of the trust fund during the lives of both, with the remainder to the survivor.

In the case of *Sprague* v. *Walton*, 145 Cal. 232, [78 Pac. 645], one Moses Sprague, in whose name there were certain savings bank deposits which were community property, "being at the time sick and confined to his bed, obtained from the banks the form of an authorization which would enable his wife to draw the deposits standing in his name, and he executed and delivered to her two orders in the form prescribed. They were substantially the same in terms, and the one addressed to the Sacramento Bank read as follows: 'January 22, 1900. I hereby authorize the Sacramento Bank to allow my wife, Mrs. N. M. Sprague, to draw any money standing to my credit on Deposit No. 17097, fol. 825, in said bank and to have the right of survivorship.' On the 30th of January Mrs. Sprague drew out the whole of the several deposits and immediately redeposited them in the same banks, but in her own name. On the 16th of March following Moses Sprague died. Letters testamentary were issued to his wife in July, 1900, and she took possession of his estate, but died in June, 1901, leaving the administration unclosed. Upon her death the plaintiff, Frederick D. Sprague and the defendant B. F. Walton were appointed joint executors in her place. Subsequently her will was proved and letters testamentary were issued to her daughter, the defendant Hattie S. Walton. As executrix of her deceased husband's will, Mrs. Sprague never charged herself with anything on account of said deposits, and what remained of them passed into the hands of her executrix, who claims that they were a gift from her father to her mother, and constituted no part of his estate." In an action to recover said money by one of the executors of the estate of Moses Sprague, deceased, against the executrix of the estate of Mrs. Sprague, deceased, the contention of the latter was that the transaction by which Moses transferred said savings deposits to his wife involved a gift, but this contention was not sustained by the trial court, which found that said transaction was devoid of some of the essential elements of a transfer by gift. The supreme court, speaking through the chief justice, while declaring that the evidence tending to show that Moses Sprague intended a gift of the deposits "was very persuasive," said that it was not in the power of an appellate

court to "make a finding nor direct one where the evidence, however persuasive, is opposed to a presumption, as in this case." The court, however, reversed the order for error of the trial court in excluding certain testimony proposed by the defendant, and in view of a retrial, felt constrained to make the following suggestion: "Even if it should be found that it was not the intention of Moses Sprague that his wife should draw out the deposits or change them to her own account in his lifetime, the form of the orders ('with right of survivorship') indicates his intention that she should take them as survivor after his death; and if such was his intention, the transaction would be brought within the doctrine of *Booth* v. *Oakland Bank,* 122 Cal. 19, [54 Pac. 370], where it was held that an arrangement substantially the same as in this case constituted the bank a trustee of the deposit for the benefit of the parties to whom the depositor desired the money to be paid in case of her death. The fact that Mrs. Sprague actually drew the money before her husband's death would not defeat the intention to create a trust in her favor."

I am unable to perceive any substantial distinction between the foregoing cases and the one at bar. If the "right of survivorship" in M. K. Carr is not clearly indicated as the intention of Michael Carr by his employment of the word "survivor" in making the transfer of the deposit to himself and M. K. Carr, as joint owners, then, as I have before in effect declared, the word as so used is not only perfectly meaningless, but must have been thus employed by Michael with the deliberate purpose that it should be regarded and treated as superfluously used, or employed without an intention on his part to thereby convey any particular thought in his mind when the act of transferring the deposit took place. But it must be assumed that he meant something or to convey some thought in his mind with regard to the transfer by the use of that word, and I am unable to reconcile its use under the circumstances with any other idea than that it was so employed for the purpose of expressing the extent or scope and nature, in legal effect, of the transfer. If, as I think is clearly true, he intended that M. K. should exercise the right of survivorship in the deposit, then, it seems to me, it becomes very clear that the intent in his mind, at the time of transferring it, was to establish a trust in said deposit for his and appellant's joint

benefit during their joint lives, with the remainder to the latter or a reversion to himself on the death of the one or the other, according as that event might happen.

The cases of *Denigan* v. *Hibernia etc. Society*, 127 Cal. 137, [59 Pac. 389], and *Denigan* v. *San Francisco Sav. Union*, 127 Cal. 142, [78 Am. St. Rep. 35, 59 Pac. 390], cited by counsel for respondents in support of the judgment here, are where one Ellen Denigan deposited with said bank certain moneys, which were her separate property, in the names of herself and husband, in the last-mentioned case the deposit being made payable to the individual order of either. Ellen subsequently died and thereupon James Denigan, her surviving husband, caused the moneys so deposited in both banks to be transferred to a new account entitled, "Frank Denigan or James Denigan," with directions to the bank from both Denigans in the last mentioned of the two cases to pay to the individual order of either. James Denigan was a nephew of Frank Denigan, and upon the death of the latter, James brought suit against the Hibernia Loan Society for the remainder of the money on deposit in said bank without any deduction for an amount paid by the bank out of said deposit to one Connolly on the order of Frank Denigan in his lifetime and after the money had been transferred to himself and James. The action against the San Francisco Savings Union was by said James to recover the amount of the deposit in said bank in the name of Frank Denigan and plaintiff.

In both cases the plaintiff's right to the money rested entirely upon the title or right which Frank Denigan had thereto, and in both cases the contention of the plaintiff was that Frank acquired a perfect title to the money through a gift thereof by his wife, Ellen. The supreme court held that the evidence failed to disclose a gift in either case. Like the case here, there was wanting in the transactions, to constitute a completed gift, the element of unqualified dominion over the deposits by Frank Denigan. As the court say: "There is no presumption in favor of a gift (*Grey* v. *Grey*, 47 N. Y. 552; *White* v. *Warren*, 120 Cal. 322, [49 Pac. 129, 52 Pac. 723]); and in the present case the idea of a gift is inconsistent with the retention by the wife of the right in herself to withdraw the whole of the money from the bank." But,

under our theory of the case at bar, it is obvious that these cases are not in point. There are no acts or language connected with the transactions which would furnish the slightest indication of an intention upon the part of Ellen Denigan to create out of the deposits a trust either in favor of herself and husband or in favor of her husband alone. While, as seen, no certain form of words is required in the creation of a trust, there must, nevertheless, be *some words,* it matters not what they are, which indicate with reasonable certainty a purpose to create a trust. (Civ. Code, sec. 2221; *Estate of Smith, supra; Egerton* v. *Brownlow,* 4 H. L. Cas. 210; *Cushing* v. *Blake,* 30 N. J. Eq. 689; Pomeroy's Equity Jurisprudence, sec. 1001.) Nor is there anything decided in the Denigan cases at cross-purposes with the proposition that a valid trust in money may be created with the power reserved by the trustor to practically revoke it by drawing on the trust fund until it is completely exhausted before the beneficiaries can enjoy the fruits thereof. (Civ. Code, sec. 2280; *Hellman* v. *McWilliams,* 70 Cal. 452, [11 Pac. 659]; *Nichols* v. *Emery,* 109 Cal. 325, [50 Am. St. Rep. 43, 41 Pac. 1089].)

But respondent contends that the case of *Booth* v. *Bank, supra,* is not in point here, for, he insists, all that is decided in that case is that the trial court erred in granting a motion for a nonsuit, and that it was the duty of said court to review and consider the evidence upon its merits to determine whether a valid trust had been established by the act and words of Mrs. Bell; and he declares that this case is to be differentiated from that, in that the court here did pass upon the evidence and decide the questions of fact upon the merits of the controversy, and that its findings are conclusive upon this court. But the court went further in the Booth case than merely to review the ruling of the trial court upon the motion for a nonsuit. It very clearly laid down the rule that, where the intention to create a trust is indicated with reasonable certainty by any words or acts of the party having the right to create a trust of the particular personal property involved in the transaction, it is the duty of the courts to so construe such transaction as to execute such intention, and it is further shown that the facts developed in that case up to the point where the nonsuit was ordered, if true, or if believed,

were enough to establish a trust, or beneficial interest in the deposit, in favor of the sisters of Mrs. Bell, enforceable after the latter's death. Moreover, in the case at bar, it is to be observed that there does not and, indeed, there could not arise, as in *Noble* v. *Learned,* 153 Cal. 247, [94 Pac. 1047], any question of conflict in the evidence. The findings themselves, as we have pointed out, disclose with "reasonable certainty" that, when Michael transferred the deposit to himself and M. K. Carr, his intention was that, after his death, the sole and exclusive right and title to the remainder should vest in and be enjoyed by the latter. The language following that finding, italicized herein, "that said deposit amounting to said sum of $996.30 was the property of said Michael Carr, and continued to be the property of said Michael Carr after said bank had so changed said deposit, and at all times until the death of said Michael Carr," involves *the statement* of a mere legal conclusion, unsupported by the finding of fact immediately preceding it or by any other finding or by any evidence produced.

If (I may repeat) any meaning is to be given to the word "survivor," as employed by Michael Carr in the transfer of the deposit to himself and appellant, it must be accorded that signification which ordinarily and naturally it would have when used in connection with the disposal of one's estate to take effect after the death of the owner, and, giving to it such meaning, it seems to me that there is no escape from the proposition that Michael adopted the means disclosed by the evidence as (to him) the most satisfactory manner and form of making his son, the appellant here, a joint beneficiary during their joint lives and the sole beneficiary after his death of so much of his estate as is involved in the deposit with which this litigation is concerned, or, in case he survived M. K., the same to revert to him. This being so, it is, as I have shown, the duty of the courts to respect and execute his intention through the medium of a trust which, as I think clearly appears from this record, can be done in perfect harmony with the facts proved and found. No argument in answer to this construction of the transaction involved here can be erected around the proposition that, in disposing of the deposit in the manner shown here, Michael thus displayed partiality to one

son as against the respondent and the other members of his
family, if there be others.  A man, as is said in *Johnson* v.
*Hubbell*, 10 N. J. Eq. 332, [66 Am. Dec. 773], "is the dis-
poser by law of his own fortune, and the sole and best judge
as to the time and *manner* of disposing it." There are, doubt-
less, many cases where persons, in the testamentary disposi-
tion of their property, have omitted to make provision for
certain heirs or persons standing in the same degree of rela-
tionship to them as those upon whom they have bestowed by
testament or otherwise a liberal share of their bounty, and in
which there does not appear any well-founded natural or
moral reason why such partiality by the ancestor should thus
have been evinced.  Such cases often present circumstances
which appeal strongly to one's sense of justice, and which,
if the law permitted, would no doubt frequently lead judges
to interpose their power and adjust the matter of the distribu-
tion of such estates in accordance with the principles of what
may be termed natural justice.  This may be one of such
cases.  But the courts cannot, in the determination of ques-
tions like those submitted here, be influenced or controlled by
the fact that the ancestor has excluded from his bounty cer-
tain of his heirs, in the absence of a showing of fraud, mental
incompetency, or that his act has been superinduced by undue
influence practiced upon him.  Whatever might have been
Michael Carr's specific reason for displaying partiality, if in
truth any was shown, it was certainly satisfactory to him, and,
as it is not shown, nor claimed, that he was, when he trans-
ferred the deposit, mentally incompetent to transact business
or that he was fraudulently imposed upon or unduly in-
fluenced by M. K. or any other person, and thus induced to
transfer said deposit, no reason can be suggested why his
intention as to the disposition of that money should not be
made effective so long as it can be done without offending any
rule or principle of law.

As stated, the alleged finding that the deposit was at all
times the sole property of Michael Carr is not a finding of fact,
but obviously an unsupported conclusion of law.  The de-
fendant was and is entitled to a judgment on the findings of
the court, and in accordance with this view, the judgment ap-
pealed from is reversed, with directions to the court below to

cause to be entered judgment on the findings in favor of the defendant, M. K. Carr.

Chipman, P. J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 25, 1911.